**Salem**

SHERMAN L. BOOTHE, SR.

v.

COMMONWEALTH OF VIRGINIA

No. 0138-86

Decided July 21, 1987

COUNSEL

J. Harold Eads, for appellant.

Marla Lynn Graff, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KEENAN, J.** — Sherman L. Boothe, Sr. was convicted of construction fraud pursuant to Code § 18.2-200.1, based on a charge that he fraudulently obtained a $200 advance of money upon an unfulfilled promise to install a septic system and a driveway. The issues presented in this appeal are: (1) whether a septic system is a "structure" within the meaning of Code § 18.2-200.1; and (2) whether the evidence was sufficient to support a finding that Boothe entered into the contract with intent to defraud. We find that a septic system falls within the scope of Code § 18.2-200.1; however, we reverse the conviction because we find the evidence insufficient to establish fraudulent intent.

On September 12, 1984, Boothe entered into a contract with Harold W. Mason, promising to install a septic system and to grade for a driveway on an undeveloped lot owned by Mason. He was paid $2,150 in advance for the work. On October 3, 1984, the contract was modified to include two more septic lines and some gravel for the driveway. Boothe was paid an additional $1,091 in advance for this work. Neither contract specified a completion

date and Mason testified that he did not question Boothe's request to be paid in advance since he had contracted with Boothe on a prior occasion and had paid him in advance at that time.

Mason testified that he told Boothe he wanted the work completed as soon as possible so he could build a house on the lot. He further testified that he contracted with a Mr. Simpson to construct the house as soon as Boothe completed his contract. He did not, however, recall informing Boothe of the pending contract for construction of the house.

Rita Smeltzer, a witness for Boothe, testified that she was present when the September contract was prepared. She testified:

> Harold Mason . . . stated that he was in no hurry for the septic system or anything until spring of the year. He just wanted to get the estimate on the job, get somebody to do it so he could turn it in to the company he was borrowing the money from.

According to Mason, Boothe brought a backhoe to his property sometime in November 1984 and cleared approximately half an acre of small cedar trees. Mason further testified that Boothe dug enough of a driveway so that "you could get a vehicle up there;" however, no other work was performed.

Mason made numerous attempts to contact Boothe regarding the status of the contract. He testified that he called Boothe and was informed by the person who answered the phone that Boothe's father was ill. In late November, Mason wrote to Boothe offering him an additional $200 to perform the contract, but demanding a full refund if the contract was not performed. According to Mason, Boothe responded with a phone call assuring him that the work would be done. Mason testified that Boothe gave him no excuse at this time for his failure to perform the contract, but in later conversations, Boothe complained of a toothache and wet ground. Mason's last contact with Boothe was in mid-January 1985, when Boothe called to again assure Mason that he would perform the contract.

Regarding the weather conditions, Mason testified that when he spoke to Boothe in December, "the weather was exceptional." Mason acknowledged, however, that in January the weather was

"extremely cold" for a period of two or three weeks, and that during this time no work could have been done on his lot. Mason was also aware that Boothe's father died in early January.

Aside from Mason's testimony, the Commonwealth produced testimony from Patricia and Ronald Payne who contracted with Boothe for the installation of a septic tank in December 1984. The Paynes testified that they paid Boothe the contract price of $2,200 in advance and that Boothe failed to perform the contract.

At the close of the Commonwealth's case, Boothe moved to strike the evidence on two grounds. First, he argued that the Commonwealth failed to demonstrate his intent to defraud. Second, he argued that the acts complained of did not fall within the scope of Code § 18.2-200.1 because the work involved raw land rather than a building or structure. The court denied the motion to strike on both grounds. Regarding the scope of Code § 18.2-200.1, the court relied on *Black's Law Dictionary*, stating:

A structure . . . is "[A] combination of materials to form a construction for occupancy, use or ornamentation whether installed on, above, or below the surface of a parcel of land." Now. A septic system, were we talking only about a driveway I believe you'd be correct. I don't think there's any question about that. But a septic system is a combination of materials. It does have a use. That use is related to the occupancy of the land. And its true that it is not installed, in normal cases, above the surface of the ground but it does fall below the surface. But apparently that structure in general usage meets the definition of a structure. So I'm going to overrule you on that.

Boothe testified in his own behalf. He acknowledged that he entered into the contract, received money, and failed to perform the work specified in the contract. He testified, however, that the reasons he did not complete the job were bad weather, his father's fatal illness, and his trial in December 1984 for rape. Regarding his business practices, Boothe testified that he routinely demanded payment in advance because he previously had trouble collecting bills. He was unable to account for the money given to him by Mason because of the way he handled his finances. He explained:

Say you got four or five jobs going. You're not going to specifically pick out one job and say well alright, this money goes to this job, this money goes to that job, and stuff like that. You can't do it that way. You just say you got four jobs here. You've got your money here. You've got to do all five jobs. You can't determine where the money is going to go.

Boothe further testified, as did his wife, that he did not have a checking account. He said that he used the proceeds of Mason's checks "to pay bills just like I do any other job." He explained that he did not separate the funds, which he apparently kept in his pocket, because "it don't make no difference if it comes from Wray's job, Mason's job, whose job, it's all together."

Boothe estimated that he spent thirty hours working on Mason's property. He testified that he did not begin work immediately because he had to finish another job and that Mason was aware of the reason for the delay. He further testified that he was delayed in starting because Mason wanted the contract modified and the modifications would require more work. It was not until after the terms of the contract were settled that Boothe believed he could begin.

Boothe described the work he did as "clearing trees . . . getting roots and everything and taking them to the lower end of the property" and "kind of leveling his lot out and burying the excess dirt, stumps, stuff like that." He testified that the weather prevented him from making better progress because:

There was, you know, some pretty days there but a lot of people don't understand. It's clay mud. It'd be dry on top but as soon as you dig down in it all you got was a big mud pile of dirt. And as soon as you run over it with a tractor a couple of times it just squeezes the water out of it. It's like a sponge.

Ultimately, Boothe was unable to perform the contract because his backhoe, which had been left on Mason's property since November, was repossessed by the bank in late January of 1985. Mrs. Boothe testified that the last payment on the backhoe was made in July 1984, and that her attempt to arrange refinancing failed. Boothe acknowledged that he fled Virginia in February 1985 to avoid sentencing on his rape conviction.

Boothe's wife, Elizabeth, testified regarding the company finances. She could not account for the proceeds of Mason's checks, although she thought that "some of it went to pay expenses and pay for materials of our supplier in order to get materials . . . for the next job which would have been Mr. Mason's." However, Mrs. Boothe could not identify any material which had been specifically purchased for the Mason job. Further, she testified that when Boothe fled Virginia in February 1985, he left her with only $200.

After hearing all the testimony, the court found Boothe guilty. The court acknowledged that there was "evidence here to support that the defendant intended to perform this work when he accepted that money." However, the court found it "incredible" that Boothe spent thirty hours working at Mason's property. In addition, the court found it "extremely significant" that there were no business records to account for the money paid to Boothe by Mason. The court also found significant the fact that the money was unaccounted for when Boothe fled to Florida. Regarding Boothe's request for payment in advance, the court stated: "It may be inferred that if he [Boothe] demanded a payment in . . . September . . . believing that the work would not have to be performed until the spring of 1985 then in that is a kernel of evidence upon which one might reasonably find that [Boothe] intended to misappropriate this money to his own use or to some other purpose other than the Mason contract in the interim." Further, the court found "very damning" the testimony of Boothe's wife that some of Boothe's suppliers were paid "from money that came into hand about the time [of] the Mason contract." Finally, in weighing the circumstances, the court noted that the backhoe payments were in default as of August 1984, and that Boothe knew when he signed the contract, he would be facing a serious criminal trial within a few months.

Code § 18.2-200.1 states:

If any person obtain from another an advance of money, merchandise or other thing, of value, with fraudulent intent, upon a promise to perform construction, removal, repair or improvement of any building or structure permanently annexed to real property, and fail or refuse to perform such promise, and also fail to substantially make good such ad-

vance, he shall be deemed guilty of the larceny of such money, merchandise or other thing.

Boothe first argues that the installation of a septic system on undeveloped land does not come within the provisions of Code § 18.2-200.1. He argues that a septic system is neither a "building" nor a "structure." The Commonwealth argues that a septic system is a "structure" within the normal usage of that term, and that the court, therefore, correctly gave the statute its plain, obvious, and rational meaning. Further, the Commonwealth argues that since the statute refers to a building *or* structure, the latter term must be interpreted to include contracts other than to construct, remove, repair or improve buildings.

The Supreme Court has stated that "the primary objective of statutory construction is to ascertain and give effect to legislative intent." *Turner v. Commonwealth*, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983). We believe that the underlying intent of the statute is to prohibit the fraudulent receipt of funds for construction work involving buildings or other structures permanently annexed to real property. We find that a septic system falls within the scope of Code § 18.2-200.1 since it is a tangible object (a "structure") permanently annexed to real property.

Boothe next argues that under Code § 18.2-200.1, the Commonwealth was required to prove he entered into the contract with fraudulent intent. He argues that in the present case, the Commonwealth failed to carry this burden. We agree.

In *Norman v. Commonwealth*, 2 Va. App. 518, 346 S.E.2d 44 (1986), this court considered the sufficiency of evidence of intent to defraud in a prosecution under Code § 18.2-200.1. As in the present case, the issue was whether the Commonwealth had demonstrated fraudulent intent at the time the contract was entered into. The court stated:

> To determine whether or not there was fraudulent intent we look to the conduct and representations of the defendant. Whether fraud actually existed will depend upon the circumstances of each case.

2 Va. App. at 519-20, 346 S.E.2d at 45 (citations omitted).

The court, in *Norman*, found sufficient evidence of intent to defraud. There, the defendant received $60,000 in return for a promise to build two cabins on undeveloped lots. The contract specifically stated that the funds were to be placed in an escrow account pending completion of construction. Further, the defendant represented that he had a warehouse containing the material needed to perform the contract. In fact, the defendant used the funds for his own purposes, never established an escrow account, and did not have a warehouse containing sufficient material to perform the contract. In addition, the court noted that Norman failed to contact the person who had given him the $60,000 when it became apparent that he would be financially unable to construct the cabins. Reviewing the evidence, the court concluded that "the jury could have inferred that he [Norman] obtained the advance money with fraudulent intent." *Id.* at 521, 346 S.E.2d at 46.

In the present case, Boothe's conduct differs from Norman's in several crucial respects. First, the Commonwealth did not establish that Boothe made any false statements to Mason inducing him to enter into the contract. While Mason testified that he wanted the work completed as soon as possible, there was no evidence that Boothe promised to begin or finish the work at any particular time. It is significant in this regard that the contract did not specify a completion date, and the court evidently credited the testimony of Boothe's witness that Mason told Boothe the job need not be completed until spring.

Second, it is undisputed that Boothe actually began working on Mason's property shortly after the November modification to the contract was signed. Further, while the court was not bound by Boothe's testimony regarding the reasons for his failure to finish the job, it is undisputed that Boothe's father was taken ill in early December and died on January 2, 1985. During this time Boothe went to Richmond twice to visit his father, and to Salem to attend the funeral. It is also undisputed that the weather in early January was not conducive to outdoor work. Boothe, unlike Norman, initiated at least one conversation in which he indicated an intent to complete his contract. Although the combination of these circumstances did not excuse Boothe from performing his contract, they weigh heavily against the conclusion that he *entered into* the contract with fraudulent intent.

Finally, unlike the contract in *Norman*, the contract between Boothe and Mason did not require that any funds be put into an escrow account. It only provided for "full payment in advance." Thus, Boothe was not prevented by the contract from cashing Mason's checks and immediately spending the money for any purpose he wished, including satisfaction of supplier and personal bills. We believe that the trial court placed undue emphasis on Boothe's inability to account for the proceeds of Mason's checks as a basis for finding that Boothe intended to defraud Mason at the inception of the contract.

■ We recognize that in reviewing criminal convictions, the evidence must be viewed in the light most favorable to the Commonwealth. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). However, where, as here, the evidence is entirely circumstantial:

> [A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt.

*Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984) (citations omitted).

■ We find that in the present case the circumstantial evidence of Boothe's fraudulent intent at the time he contracted with Mason was insufficient to sustain the conviction. *Compare Riegert v. Commonwealth*, 218 Va. 511, 520, 237 S.E.2d 803, 809 (1977). At best it only created a suspicion of guilt. "[A] suspicion of guilt, however strong, or even a probability of guilt, is insufficient to support a criminal conviction." *Bishop*, 227 Va. at 170, 313 S.E.2d at 393. Accordingly, the judgment of the trial court must be reversed.

*Reversed and dismissed.*

Koontz, C.J., and Moon, J., concurred.