## Norfolk

KAREN DIEHL

v.

## COMMONWEALTH OF VIRGINIA

No. 1197-87-1

Decided September 12, 1989

COUNSEL

Robert Gray Morecock (Thomas B. Shuttleworth; Shuttleworth, Ruloff, Giordano & Kahle, P.C., on brief), for appellant.

David A. Rosenberg, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

KEENAN, J.—Karen Diehl was convicted of involuntary manslaughter, abduction, child neglect and assault and battery. In accordance with the jury's verdict, she was sentenced to ten years imprisonment for involuntary manslaughter, ten years for abduction, ten years for child neglect and twelve months for assault and battery. The issues presented in this appeal are: (1) whether the trial court erred in failing to strike a juror for cause; (2) whether the trial court erred in allowing the Commonwealth to proceed on indictments alleging abduction and felony murder; (3) whether the trial court erred in allowing cameras in the courtroom; (4) whether the trial court erred in admitting in evidence Commonwealth's Exhibit twelve, a photograph depicting the victim; (5) whether the trial court erred in prohibiting evidence of the victim's prior medical and psychiatric treatment; and (6) whether the trial court erred in admitting a videotape of Karen Diehl's interrogation by the police. We conclude that Diehl was denied her constitutional right to trial by an impartial jury and for this reason we reverse her convictions. Because this case may be retried, we also address the remaining issues that were properly preserved for appellate review.

I.

On October 24, 1986, rescue workers were called to the Indian Grove Campground in Virginia Beach to provide medical assistance to Karen Diehl's thirteen-year old adopted son, Andrew Dominic Diehl (the "victim"), who was reported to be unconscious. Approximately six weeks earlier, Diehl and her husband had brought the victim and their sixteen other children to the campground in a converted school bus which was temporarily serving as the family's home. Thirteen of the Diehl children were adopted. With one possible exception, the adopted children had

varying degrees of physical and mental handicaps. When the rescue workers arrived at the campground, they discovered the victim on the floor of the school bus. He was not breathing and had no pulse. The rescue workers determined that the victim was clinically dead, in a state of cardiac arrest, even though an EKG indicated that some electrical activity remained in his heart.

The victim was transported to the Virginia Beach General Hospital where he remained in a deep coma until he died in the early morning hours of October 29, 1986. He weighed under seventy pounds when he was admitted to the hospital. Dr. J. A. Thomas, a pediatrician who examined the victim on October 24, 1986, compared his weight to that of an average nine-year, nine month old child. Dr. Thomas testified that the victim's injuries included "extensive bruising over his face and, [in] particular, over his left eye, over his trunk, over his limbs. There were circular marks over both wrists and both ankles. There was swelling of both hands and both feet, and he had two large areas of skin loss, one on each buttock." Dr. Thomas also testified that the victim was "in shock" and had suffered a head trauma caused by battering. Additionally, the Doctor diagnosed the victim as being hypothermic, hyperglycemic, and dehydrated.

Dr. Wanger, who performed the autopsy, testified that the victim had received multiple contusions to the brain. The tissue in two areas of the victim's brain had died and was degenerating. According to Dr. Wanger, the victim "died from head injuries due to blows."

Several of Karen Diehl's children testified that, with the exception of a few occasions, from the time the Diehls arrived at the Indian Cove Campground in Virginia Beach on September 15, 1986, until October 24, 1986, when the victim was brought to the hospital, he had been continuously tied to the floor of the bus with a pipe clamp on one hand, a handcuff on the other, and rope around his feet. For most of this time, the victim was nude.

Karen Diehl testified that during a five week period at the Indian Cove Campground, the victim was permitted to leave the bus on only four or five occasions. Her testimony also revealed that on two occasions during this time period, she beat the victim's bare bottom with a paddle until his bottom bled. She admitted that on one occasion she beat the victim's bare buttocks one

hundred times. Similarly, she testified that there were occasions when she hit the victim in the head with a paddle as many as thirty times. Karen Diehl also stated that she forced the victim to eat his feces and lick his urine off the schoolbus floor on several occasions. She further admitted that she struck him directly on the top of his head with a paddle three or four days before he was brought to the hospital.

## II.

Diehl first argues that she was deprived of her constitutional right to trial by an impartial jury because the trial court erred in the jury selection process. Specifically, she argues that the trial court's failure to remove juror Clifford from the jury panel constituted an abuse of discretion. We agree.

■ Every individual accused of committing a crime has the right to an impartial jury as a matter of constitutional guarantee. This guarantee is reinforced by legislative mandate and by the Rules of Court. *Martin v. Commonwealth*, 221 Va. 436, 444, 271 S.E.2d 123, 128 (1980). The right to an impartial jury does not necessarily require that those who have developed opinions based on the media's coverage of a case be precluded from serving as jurors. *See Reynolds v. United States*, 98 U.S. 145 (1878). However, after *voir dire* examination, the trial court must be confident that a juror will consider only the evidence introduced at trial in reaching a verdict.

■ "Whether a venireman can lay aside a preconceived opinion and render a verdict solely on the evidence is a mixed question of law and fact," the resolution of which lies within the sound discretion of the trial court. *Calhoun v. Commonwealth*, 226 Va. 256, 258, 307 S.E.2d 896, 898 (1983). A trial court's determination whether a juror has formed an opinion that is "constitutionally impartial" will not be set aside on appeal unless the error is manifest. *Briley v. Commonwealth*, 222 Va. 180, 185, 279 S.E.2d 151, 154 (1981). It is firmly established, however, that veniremen must stand indifferent to the cause and that a biased juror must be excluded. *Breeden v. Commonwealth*, 217 Va. 297, 298, 227 S.E.2d 734, 735 (1976); *Salina v.Commonwealth*, 217 Va. 92, 93, 225 S.E.2d 199, 200 (1976).

■ Reasonable doubt as to a juror's impartiality must be resolved in favor of the accused. *See, e.g., Breeden*, 217 Va. at 298, 227 S.E.2d at 735. In *Breeden*, the Supreme Court explained:

"[A prospective juror] must be able to give [the accused] a fair and impartial trial. Upon this point nothing should be left to inference or doubt. All the tests applied by the courts, all the enquiries made into the state of the juror's mind, are merely to ascertain whether he comes to the trial free from partiality and prejudice.

If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion. For, as has been well said, it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible."

*Id.* (quoting, *Wright v. Commonwealth*, 73 Va. (32 Gratt.) 941, 943 (1879)). If *voir dire* examination discloses that a juror is biased and will not be able to consider a case with total impartiality, that juror must be removed. *Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 387, 349 S.E.2d 903, 906 (1986).

■ When considering whether a prospective juror should have been excluded for cause, this Court must consider the entire record of the *voir dire* rather than isolated questions and answers. *Mullis v. Commonwealth*, 3 Va. App. 564, 570, 351 S.E.2d 919, 923 (1987). Since the trial court has the opportunity to weigh the prospective juror's answers in the context of his overall demeanor, as well as the manner in which the questions were posed to him, its decision is entitled to great deference. *Id.* Applying these principles, from our review of the record we find that the responses elicited from prospective juror Clifford during the *voir dire* examination demonstrate that he was biased against Karen Diehl.

Clifford ackowledged that his opinions were influenced by the media. He stated that he thought Diehl was "kind of guilty" and admitted that he would have to be presented with evidence for this opinion to change. Clifford also admitted that he did not know whether he would convict or acquit Diehl if he believed that she was only probably guilty. Despite this, when asked whether he could disregard the publicity surrounding the case and whether he

could base his decision solely on the evidence presented in court, Clifford responded, "Yes." He also stated that he could hear the case with an open mind and that he would have to hear all the facts before making a final decision. Similarly, when asked by defense counsel whether Diehl would have to prove her innocence he replied, "[N]o proof from her, no."

As illustrated, Clifford clearly had an opinion concerning this case when the *voir dire* examination began. Therefore, on appeal we must determine whether his assurances that he could lay aside his preconceived opinion and receive the evidence impartially represented his true feelings or rather were the result of the leading questions posed to him. Portions of the *voir dire* proceeding, which are relevant to the resolution of this issue, are set forth in the appendix.

In the present case, we believe that the record as a whole indicates that Clifford was not "indifferent to the cause." Although Clifford stated that he was capable of remaining impartial and reaching a verdict based solely on the evidence presented at trial, we find that this plea of neutrality did not come from Clifford himself.

> [T]he true test of impartiality lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair should come from him uninfluenced by persuasion or coercion by anyone, least of all by the trial judge, who is charged with the duty of remaining impartial himself, and seeing that the panel is composed of impartial and unbiased men.

*Bausell v. Commonwealth*, 165 Va. 669, 682-83, 181 S.E. 453, 458 (1935); *see also Parsons v. Commonwealth*, 138 Va. 764, 773, 121 S.E. 68, 70 (1924); *Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 389, 349 S.E.2d 903, 907 (1986).

Like most prospective jurors, Clifford was unfamiliar with the legal theories on which he was questioned at length. Further, the questions posed to him did not involve subjects on which he held strong moral, personal, or religious convictions. We believe that these factors made Clifford susceptible to suggestion, especially when he was questioned by the court.

■ Although the questions posed by the trial court were not argumentative, they were leading, long, and complex. The record before us demonstrates that the trial court attempted to rehabilitate Clifford as a potential juror by use of these questions. Efforts to rehabilitate a juror by asking long, complex or leading questions which are akin to persuasive suggestions are an ineffective means of rehabilitation. *Breeden*, 217 Va. at 300, 222 S.E.2d at 736. Despite the lengthy questions posed to Clifford by the trial court, near the end of his *voir dire* examination and immediately prior to saying he could set aside his thoughts and opinions and make a decision based solely on the law and the evidence presented in the courtroom, Clifford said that he believed what he had read in the newspaper "kind of throws in the guilty side a little bit there." Due to this response, we have no confidence in Clifford's assurances of impartiality. Further, we believe that Clifford was questioned in a suggestive manner which influenced his responses. Therefore, we find that the trial court's efforts to rehabiltate Juror Clifford failed and we hold that the trial court abused its discretion and committed manifest error in failing to remove Clifford from the jury panel.

In addition to her objection regarding individual jurors, Diehl raises an objection to the process by which the trial court regulated the questioning of all prospective jurors. Specifically, Diehl argues that the trial court erred in refusing to require the Virginia Beach Department of Social Services to reveal the names of the foster parents with whom the Diehl children were placed so that these names could be disclosed to the prospective jurors during their *voir dire* examinations. The foster parents were neither participants nor witnesses in the trial. Further, no showing was made that any of the foster parents were involved in the matter until after the time of the alleged crimes. Therefore, we find that the trial court did not abuse its discretion in limiting this inquiry by only asking the jurors whether they knew any of the foster parents of any of the Diehl children. The question posed by the trial court was sufficient to preserve Diehl's right to trial by an impartial jury. *See Poyner v. Commonwealth*, 229 Va. 401, 414-15, 329 S.E.2d 815, 825-26, *cert. denied*, 464 U.S. 1063 (1984).

## III.

Diehl next argues that a parent cannot be held criminally liable under Code § 18.2-47 for the abduction of her own child. Accordingly, she maintains that her conviction on the abduction charge must be reversed. She also argues that because the Commonwealth elected to base its murder indictment on a theory of felony murder utilizing abduction as the predicate felony, her manslaughter conviction was tainted and must be reversed as well. We disagree with both contentions.

Initially, we note that Diehl specifically requested and approved the involuntary manslaughter instruction which was given by the trial court. Further, we find that because the element of abduction was unique to the felony murder charge and was not an element of the involuntary manslaughter charge, Diehl's contention that her manslaughter conviction was tainted is misplaced. The jury was instructed that the involuntary manslaughter charge was unrelated to and independent of the abduction and the felony murder charge. The court instructed the jury as follows:

> If you find from the evidence that the Commonwealth has failed to prove beyond a reasonable doubt each of the second two elements of the offense [first degree murder] as charged [i.e., that the killing was malicious and that it occurred in the commission of, or attempt to commit, the abduction of Andrew Diehl], but you do find that the Commonwealth has proved beyond a reasonable doubt that Karen Diehl killed Andrew Diehl and further: (1) That the killing, although unintended, was the direct result of negligence so great as to show a reckless disregard of human life . . . then you shall find Karen Diehl guilty of involuntary manslaughter. . . .

We also find that Diehl is incorrect in her assertion that a parent cannot be held criminally liable under Code § 18.2-48 for the abduction of her own child. This issue presents a matter of first impression in Virginia. Further, it appears that there are no reported cases in other jurisdictions where a parent has been convicted for abduction pursuant to a statute similar to Virginia Code § 18.2-47, under circumstances involving the forcible detention of a child in his home. Therefore, we rely primarily on our construc-

tion of Code § 18.2-47 in making this determination.

■ The primary purpose of statutory construction is to determine and give effect to legislative intent. *Boothe v. Commonwealth*, 4 Va. App. 484, 490, 358 S.E.2d 740, 744 (1987). Penal statutes must be strictly construed against the Commonwealth and applied only to cases falling clearly within the language of the statute. *Crews v. Commonwealth*, 3 Va. App. 531, 536, 352 S.E.2d 1, 3 (1987).

■ It is well settled that the plain, obvious and rational meaning of a statute is preferred over a curious, narrow or strained construction in determining legislative intent. *Harward v. Commonwealth*, 229 Va. 363, 365, 330 S.E.2d 89, 90 (1985). Thus, when a statute's language is clear and unambiguous, it must be given its plain meaning and intent. *Brown v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985). In such a situation, resort to extrinsic facts and legislative history is not permitted; words must be taken as written to determine their meaning. *Id.*

(10) Diehl was convicted of abduction in violation of Code § 18.2-47.[1] We believe that the language of Code § 18.2-47 is clear and unambiguous. The statute does not exempt parents from liability. Rather, it prescribes a reduced punishment for parents when they abduct their own children under particular circumstances.

The first paragraph of Code § 18.2-47 defines the crime of abduction and establishes to whom it applies. The drafters explicitly

---

[1]  Code § 18.2-47 states: Any person, who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction"; but the provisions of this section shall not apply to any law-enforcement officer in the performance of his duty. The terms "abduction" and "kidnapping" shall be synonymous in this Code.

Abduction for which no punishment is otherwise prescribed shall be punished as a Class 5 felony; provided, however, that such offense, if committed by the parent of the person abducted and punishable as contempt of court in any proceeding then pending, shall be a Class 1 misdemeanor in addition to being punishable as contempt of court. Provided further, however, that such offense, if committed by the parent of the person abducted and punishable as contempt of court in any proceeding then pending and the person abducted is removed from the Commonwealth by the abducting parent, shall be a Class 6 felony in addition to being punishable as contempt of court.

made the statute applicable to "any person" except "any law-enforcement officer in the performance of his duty." There is no language in the statute which exempts parents. If such had been the legislature's intent, it could have accomplished that purpose by employing explicit language in the section of the statute which exempts law enforcement officers.

Diehl argues that the phrase "without legal justification or excuse" provides an exemption for parents who have legal custody of their children. Diehl, who had legal custody of the victim, contends that abduction is merely a crime against lawful custody and that a parent with lawful custody of a child cannot detain "without legal justification or excuse." We disagree.

The fact that a parent has legal custody of a child does not give that parent a right to administer punishment to that child by manacling and forcibly detaining the child for an extended period of time. A parent or one standing *in loco parentis* may be held criminally liable "if he exceeds or abuses his authority to correct a child and inflicts corporal punishment which exceeds the bounds of due moderation in the measure of it or in the instrument used for the purpose." *Carpenter v. Commonwealth*, 186 Va. 851, 860, 44 S.E.2d 419, 423 (1947) (person standing *in loco parentis* found guilty of assault and battery for inflicting punishment which exceeded due moderation). Similarly, a parent who exceeds her custodial rights, which at times must necessarily involve the detention of her child and thus deprive the child of his personal liberty, can exceed her authority and be held responsible under Code § 18.2-47. Clearly, custodial rights are not unlimited. A parent has no inherent right to detain or secrete her child in a manner that is not in the best interest of the child and that is so extreme as to fall beyond any rational notion of appropriate parenting. "The right [to punish] cannot be used as a cloak for the exercise of malevolence or the exhibition of uncontrolled passion on the part of the parent." *Id.* When the detention exceeds the bounds of moderation and becomes cruel and malevolent, legal justification ceases and abduction occurs. Therefore, we find that Diehl's status as a parent did not give her legal justification or excuse to manacle and forcibly detain her child at her whim without facing criminal liability under Code § 18.2-47. Whether the detention of approximately six weeks proved in this case was without justification or excuse was a question of fact for the jury's

determination.

## IV.

Next, we examine the second paragraph of Code § 18.2-47 which fixes the punishment for the crime. The statute clearly states that where "no punishment is otherwise prescribed," violation of the statute is a Class 5 felony. Punishment for the crime is "otherwise prescribed" in only two situations:

[1] if [the abduction is] committed by the parent of the person abducted and punishable as contempt of court in any proceeding then pending; [or]
[2] if [the abduction is] committed by the parent of the person abducted and punishable as contempt of court in any proceeding then pending and the person abducted is removed from the Commonwealth by the abducting parent.

Code § 18.2-47.

The plain language of the statute indicates that parents who violate the statute under any circumstances other than those set forth above commit "abduction for which no punishment is otherwise prescribed." Diehl falls into this category because she did not abduct her child under circumstances punishable as contempt of court. We believe that the two special categories of punishment were designed to cover the detention or transportation of a child in violation of a custody order during the pendency of a proceeding on custody or visitation. Such a situation was not present here. Therefore, we conclude that the legislature never intended to preclude a parent from being convicted under Virginia Code § 18.2-47, and we further find that the trial court did not err in allowing the Commonwealth to proceed against Diehl on indictments alleging abduction and felony murder.

## V.

Diehl next argues that the trial court erred in allowing cameras in the courtroom during her trial. Specifically, she argues that when the trial court permitted cameras in the courtroom pursuant

to Code § 19.2-266[2] and Rule 1:14[3] of the Rules of the Supreme Court of Virginia, her constitutional right to ·equal protection

---

[2] Code § 19.2-266 provides in part: In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any persons whose presence would impair the conduct of a fair trial, provided that the right of the accused to a public trial shall not be violated.

A court shall not permit the taking of photographs in the courtroom during the progress of judicial proceedings or the broadcasting of judicial proceedings by radio or television, but may authorize the use of electronic or photographic means for the perpetuation of the record or parts thereof. This prohibition shall not apply to a two-year experimental program to be established effective July 1, 1987, and administered by the Supreme Court of Virginia. This experimental program shall be conducted in the Supreme Court, the Court of Appeals, and in two circuit courts and two general district courts, one of each in a rural location and one of each in an urban location, to be designated by the Supreme Court. In addition to the rules set forth hereinafter, the Supreme Court and the Court of Appeals shall have the authority to promulgate such rules as they deem necessary to govern electronic media and still photography coverage in their respective courts. The following rules shall serve as guidelines for the experimental program and a violation of these rules may be punishable as contempt:

### Coverage Allowed.

1. The presiding judge shall at all times have authority to prohibit, interrupt or terminate electronic media and still photography coverage of public judicial proceedings. The presiding judge shall advise the parties of such coverage in advance of the proceedings and shall allow the parties to object thereto. For good cause shown, the presiding judge may prohibit coverage in any case and may restrict coverage as he deems appropriate to meet the ends of justice.

2. Coverage of the following types of judicial proceedings shall be prohibited: adoption proceedings, juvenile proceedings, child custody proceedings, divorce proceedings, temporary and permanent spousal support proceedings, proceedings concerning sexual offenses, proceedings for the hearing of motions to suppress evidence, proceedings involving trade secrets, and in camera proceedings.

3. Coverage of the following categories of witnesses shall be prohibited: police informants, minors, undercover agents and victims and families of victims of sexual offenses.

4. Coverage of jurors shall be prohibited expressly at any stage of a judicial proceedings, including that portion of a proceeding during which a jury is selected. The judge shall inform all potential jurors at the beginning of the jury selection process of this prohibition.

5. To protect the attorney-client privilege and the right to counsel, there shall be no recording or broadcast of sound from such conferences which occur in a court facility between attorneys and their clients, between co-counsel of a client, between adverse counsel, or between counsel and the presiding judge held at the bench or in chambers.

[3] Rule 1:14 provides: A court shall not permit the taking of photographs in the courtroom during the progress of judicial proceedings or the broadcasting of judicial proceedings by radio or television, but may authorize the use of electronic or photographic means for the preservation of the record or parts thereof. This prohibition shall not apply to a two-year experimental program to be established effective July 1, 1987, pursuant to Code § 19.2-266, which allows electronic media and still photography coverage in certain courts designated by the Supreme Court of Virginia. Pursuant to the statute, the Supreme Court

under the law was violated because the provisions allowing cameras on an experimental basis did not apply to every court in Virginia. We disagree.

■ Absent a showing of prejudice of constitutional dimension, the mere presence of cameras in a courtroom does not render a trial unfair. *Chandler v. Florida*, 449 U.S. 560, 582 (1981). The decision whether to allow cameras in the courtroom in a particular case is submitted to the sound discretion of the trial court. Code § 19.2-266. In the case before us, Diehl presented no evidence indicating that the presence of cameras in the courtroom prejudiced her in any way. Therefore, we find no abuse of discretion by the trial court on this issue.

■ We also reject Diehl's claim that the presence of cameras in the courtroom was so unreasonable that it deprived her of her constitutional right to equal protection under the law. "Territorial uniformity" within a state is not a requirement of equal protection. *Salsburg v. Maryland*, 346 U.S. 545, 551 (1954). The equal protection clause simply requires that "no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." *Salsburg*, 346 U.S. at 551 (quoting *Missouri v. Lewis*, 101 U.S. 22, 31 (1879)). In the case before us, we find that Diehl was not subjected to treatment which differed from that afforded to others tried in the Circuit Court of the City of Virginia Beach. Thus, her equal protection claim is without merit.

## VI.

Diehl next asserts that the trial court erred in admitting Commonwealth's Exhibit twelve, a photograph of the victim, into evidence. She contends that the foundation testimony was insufficient to establish that the photograph accurately depicted the victim's

of Virginia hereby designates the following courts for participation in this experimental program:
The Supreme Court of Virginia;
The Court of Appeals of Virginia;
The Circuit Court of the City of Virginia Beach;
The Circuit Court of Bedford County;
The Charlottesville General District Court; and
The Caroline County General District Court.

condition at the time he was brought to the hospital. We decline to reach the merits of this issue here because on remand, the admissibility of that photograph will have to be determined in the context of the foundation testimony presented at the new trial.

## VII.

We do not address the merits of Diehl's contention that the trial court erred in prohibiting evidence of the victim's prior medical and psychiatric treatment. At trial, Diehl failed to make a proffer as to what Dr. Magier's testimony would be or as to what the medical records would reveal. Therefore, she is barred from raising this issue on appeal. *Speller v. Commonwealth*, 2 Va. App. 437, 440, 345 S.E.2d 542, 545 (1986).

## VIII.

We also find that Diehl is procedurally barred from claiming that the trial court erred in admitting into evidence the videotape of her interrogation by the police. The record contains only a few scattered references to this issue. The transcript of the February 25, 1987, suppression hearing was never made a part of the record. Diehl's motion to suppress, which was made a part of the record, failed to state the grounds of her objection to the videotape. Other references in the record, which include an order denying the motion without stating the reasons for the denial, a brief recitation that the suppression motion was heard and denied, and a reference by defense counsel to the court's previous ruling on the matter, fail to provide us with the substantive reasons for the trial court's ruling. Since the resolution of this issue would require a review of the testimony contained in the transcript of the suppression hearing, we are unable to address its merits. *Turner v. Commonwealth*, 2 Va. App. 96, 99, 341 S.E.2d 400, 402 (1986).

For the reasons stated, we reverse the convictions appealed from and remand this cause to the trial court for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*

Barrow, J., and Benton, J., concurred.

## APPENDIX

THE COURT: . . . Now because these charges involve a mother and an adopted son, are you aware of any biases or prejudices that you might have about the case because of the nature of these charges?

CLIFFORD: Well, I have been thinking that she is kind of guilty in a way. She ought to deserve some kind — I don't know how to put that — some kind of a trial anyway.

THE COURT: Have you decided before you have heard the evidence that she is guilty?

CLIFFORD: No, not really.

THE COURT: Then the question I'm asking you is: Because of the nature of these charges, do you feel that you cannot consider this case fairly and impartially? Let me rephrase that. Do you know what the charges are:

CLIFFORD: Yes, Sir.

THE COURT: Do you feel that you can consider this case fairly and impartially?

CLIFFORD: I believe I probably could, yes, sir.

* * * *

THE COURT: Well, in response to an earlier question, it seemed that you were telling me that based on what you had read and heard in the media you have formed some kind of an opinion about this case. Is that correct?

CLIFFORD: I did say that.

THE COURT: You have?

CLIFFORD: I did say that, yes.

THE COURT: What did you mean when you said that?

CLIFFORD: Just by reading — by what I read in the paper, just that maybe she would deserve to go to trial for what she has done and the outcome would be from there.

THE COURT: Have you formed an opinion as to whether or not she is guilty or innocent of these charges, guilty or innocent of the charges?

CLIFFORD: Not really.

THE COURT: Are you sure that you haven't formed any opinion about her guilt or innocence?

CLIFFORD: I really haven't given it that much thought really, to tell you the truth.

THE COURT: Then it is your feeling from what you have read that she should go to trial?

CLIFFORD: She should go to trial, yes, sir.

THE COURT: If you are chosen to sit on this jury, you will be expected to make any decision that you reach based upon what you hear in the courtroom and not on anything that you may have heard before or anything that you may hear outside the courtroom, just what the witnesses testify to. Do you understand that?

CLIFFORD: Yes, Sir.

THE COURT: You don't have any experience with jury service, do you?

CLIFFORD: No.

THE COURT: Television frequently distorts what happens in the courtroom, but the concept is essential, that people understand that they just make their decision based upon what they heard in the courtroom. There has been a lot of publicity about this case. Can you put all that out of your mind if you are chosen to sit?

CLIFFORD: Yes, sir.

THE COURT: Are you sure about that?

CLIFFORD:      I believe I can.

\* \* \* \*

THE COURT:     If you are chosen to sit on this jury, Mr. Clifford, do you think you could come in here and judge this case with an open mind?

CLIFFORD:      I think I could.

\* \* \* \*

BY COUN-
SEL:
(Phillips)     Will you, sir, base your decision on the evidence presented in court and solely on that evidence?

CLIFFORD:      Yes.

\* \* \* \*

COUNSEL:
(Shuttleworth)     You said that all you know about the case is just what you read in the paper and that what you read in the paper was that she beat her child and the child was tied down and whipped. And then just a minute ago there was an exchange between you and Mr. Phillips about I don't think a child ought to be beaten with a stick. Do you remember reading about Andrew getting beaten with a stick in this case?

CLIFFORD:      I don't know exactly what the paper stated. I just said that. I don't know if it was a stick or what they used.

COUNSEL:      With regard to your statement about the fact that you think she deserves to go to trial for what she has done, do you think she has done something?

CLIFFORD:      According to the paper. I have no opinion on what she had done until I hear the facts. Just according to what the paper states and the television states she has done something.

COUNSEL: Now the Court has instructed you on presumption of innocence and proof beyond a reasonable doubt and the fact that the defendant doesn't have to put any evidence on. Would we have to present any evidence to you to change whatever opinion you held based on what you read in the newspaper about it?

CLIFFORD: Yes.

THE COURT: Wait just a second, Mr. Shuttleworth. Just a second. He may not have remembered all that.

COUNSEL: May not remembered all what?

THE COURT: You go through presumptions of innocence and burden of proof. Those mean something to you. This gentleman has never been in a criminal case. You have to go through all of it with him.

COUNSEL: All right, sir. He gave an answer which I would like recorded.

THE COURT: What was the answer?

CLIFFORD: I don't remember what I said. I think I said yes. I don't remember.

THE COURT: It was my opinion that he responded to an inaccurate and unfair question. Mr. Clifford, I went over this earlier with you to prepare for this line of questioning. Let me go over it with you again. The law is that everybody is presumed to be innocent. This lady is innocent until the jury finds her guilty and not a moment before. We talk about her being cloaked in a cloak of innocence. That is an essential tenet in our system. It is also a law in our system that the Commonwealth's Attorney must prove a person's guilt beyond a reasonable doubt. That means that the defendant doesn't have to do anything. Do you understand all of that?

CLIFFORD: Yes, sir.

THE COURT: Now what Mr. Shuttleworth wants to know is based upon what you have read in the paper and anything you may have gathered from this case, would you require the defendant to do anything to change your mind about what you think about her?

CLIFFORD: No.

* * * *

COUNSEL: (Shuttleworth) If the Commonwealth put on evidence that made you think she was probably guilty, but not beyond a reasonable doubt, would you convict her or acquit her?

CLIFFORD: I don't really know.

THE COURT: If I instruct you that to find this lady guilty you must find her guilty beyond a reasonable doubt — if I told you that is the law — and you didn't think that she was guilty beyond a reasonable doubt, you just thought she was probably guilty, would you find her guilty?

CLIFFORD: No.

* * * *

COUNSEL: (Shuttleworth) Well, you said it first to the Judge's questions — I don't mean to be going over this — that you thought she was kind of guilty from what you read in the paper. Do you still hold that belief?

CLIFFORD: Well, I won't until I hear the facts on what has been applied to Court. There is no way really to say one way or the other until you hear all the facts of what is going on. I don't know all the facts except for what the paper writes — that is all I have got — and the television news. Whether they are right or wrong, I don't know.

COUNSEL: Right now do you think she is kind of guilty?

| | |
|---|---|
| CLIFFORD: | In a way, a little bit, just by reading in the paper. |

\* \* \* \*

| | |
|---|---|
| THE COURT: | How do you mean "kind of guilty" in light of what I have said to you as far as what the law is about reasonable doubt and presumption of innocence? |
| CLIFFORD: | I don't really know. |
| THE COURT: | I realize we are using concepts here that I went to law school to learn and I have been a practicing lawyer for ten years and Mr. Shuttleworth has been a lawyer for fifteen or more years. To us, it is like — what did you do in the Navy? What was your job in the Navy? |
| CLIFFORD: | Aircraft mechanic. |
| THE COURT: | It is like picking up a wrench and trying to fix an airplane. I understand that you are confused about some of these concepts. That is why we keep going over them with you. I told you that she is presumed innocent. Can you do that? Can you presume her innocent? |
| CLIFFORD: | Until I hear all the evidence, I think I could. |
| THE COURT: | You have said that before. So what do you mean when you say to Mr. Shuttleworth that you think she is "kind of guilty?" |
| CLIFFORD: | I don't know. Just by reading in the paper where she has molested her child or beat her child. It kind of throws in the guilty side a little bit there. Really, she is not guilty until all of the evidence is out. |
| THE COURT: | These thoughts, opinions, you formed about this case, if you are chosen to sit on this panel, can you put them aside and make a decision in this case based just on the law and the evidence that you hear in the courtroom? |
| CLIFFORD: | I believe so. |

* * * *

COUNSEL:        Would you require any proof from Mrs. Diehl
(Shuttleworth)  to convince you that she wasn't guilty of some
                of the charges brought against her; and so,
                what proof would you require?