## Alexandria
## DAUNG SAM
### v.
## COMMONWEALTH OF VIRGINIA
No. 1605-89-4
Decided November 19, 1991

COUNSEL

John L. McGann, for appellant.

John H. McLees, Jr., Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

KOONTZ, C.J.—In a jury trial, Daung Sam, appellant, was convicted of first degree murder, robbery, abduction, use of a firearm in the commission of these felonies and conspiracy to commit these felonies. On appeal Daung argues that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred by refusing to instruct the jury that the common law defense of duress can be based upon threats to harm the defendant's family. For the reasons that follow, we affirm Daung's convictions.

The criminal charges against Daung arose from the following undisputed facts. On Monday, September 5, 1988, Fred Liu, the owner of a local restaurant known as the "Grand Garden," was found dead in his car in Glen Carlyn Park in Arlington County. His arms were tied behind his back with a necktie and he had been shot in the head and neck four times at close range. The positions of the bullets recovered from Liu's body and his car suggested that two of the bullets had been fired from the front seat of the car, and two more had been fired from outside the car on the driver's side. Although Liu always carried a wallet with him, and was last seen alive carrying a brief case, neither his wallet, his brief case, nor his keys were ever recovered. However, one of Liu's pants pockets had been turned inside out, and his identification card was found under the floormat of the passenger side of his car.

Following an investigation by the police, Daung was charged with the crime along with John Cheng and Samo Kim. At Daung's trial, Mohamad Amir testified that he was a friend of Daung and Samo, and through them was acquainted with Cheng. Amir testified that on Saturday, September 3, he, Samo and Daung were helping Cheng and his girlfriend to move into a new home. During that time, in the presence of all three, Cheng said that he needed money and was going to get a lot of money. According to Amir, Cheng said "[h]e was going to do a restaurant," meaning that he was going to rob a restaurant. Cheng's plan was that he was going to go in at a certain time, and "we are going to go back at a certain time." No one responded verbally to Cheng, although Amir testified that some of the listeners may have nodded. While at Cheng's house, Amir saw a bag containing a sawed-off shotgun.

On that same night, Daung, Samo, Amir and Cheng went to the restaurant owned by Liu. Cheng claimed that he knew Liu and suggested that they go to his restaurant for a drink. Upon leaving the restaurant, Amir heard Cheng speak to the receptionist and ask her to have Liu call him. Cheng gave the receptionist a piece of paper with his phone number on it.

The next day, Sunday, September 4, the four men drove to Richmond in Amir's car. On the return trip, Cheng rode in the front and Daung and Samo rode in the back. During this time, Cheng said to Daung and Samo, "I am going to do it tonight. Bring the gun and the jeep." Daung and Samo had been sleeping in the back seat during this part of the trip, and Amir could not see if they were awake or tell if they heard Cheng's remarks. Amir did not hear a verbal reply. Later that night, Amir saw Cheng put a bag containing the sawed-off shotgun into the jeep.

The jeep belonged to Cheng and he commonly allowed Daung or Samo to keep and use it. After the murder, the jeep was recovered by the police in Washington, D.C. In this vehicle the police found, among other things, an American Express receipt with Liu's name on it, a wad of electrical tape of the same type as a piece of tape found on the floorboards of Liu's car, and the sawed-off shotgun which had the same type of tape on its butt. From the door jam of the jeep, the police recovered a bullet which was later determined to have been fired from the same gun as the four bullets which had killed Liu.

When Daung was arrested and interviewed by the police, he initially told them that he knew Cheng but had not seen him for the last two or three months. He denied any knowledge of the Liu murder. Subsequently, when confronted with the fact that witnesses said they had seen Daung with Cheng several times during the weekend, Daung gave the police a statement concerning the Liu murder. This statement was transcribed and played for the jury. In contrast to his initial statement, Daung said that he, Samo, and Cheng went to Liu's restaurant in Cheng's jeep at about 10:00 or 10:30 on Sunday evening, September 4. At Cheng's direction, Daung parked the jeep on the far side of the street from the shopping center where the restaurant was located. Cheng went into the restaurant alone. After a short time, Cheng came out of the restaurant with his friend, Liu, and the two men got into Liu's car. Cheng directed Daung to follow them in the jeep. After following Liu's car over a round-about route, Liu finally stopped his car at a location adjacent to the Kenmore Elementary School soccer field. At that time, Cheng rolled down his window and directed Daung to wait at that location, saying he would return in ten to fifteen minutes. Daung and Samo did as they were instructed. Thereafter, they saw Cheng walking toward them across the soccer field, carrying a brief case. Cheng told Daung and Samo that he had killed Liu by shooting him three. or four times. When Daung asked Cheng what was in the brief case, Cheng said it contained only papers. Daung claimed he was shocked and prevailed upon Cheng to drive him home.

In his statement, Daung admitted that he had thought it peculiar when Cheng directed him to park on the far side of the street from the restaurant, and had wondered why he could not come into the restaurant when Cheng went there to talk to "his friend." However, because he was afraid of Cheng, he had not wanted to "know too much."

Daung initially denied having been near Liu's car. However, when asked if his fingerprints might be on the car, he changed his statement and said that after Liu had been killed, at Cheng's direction, he, Samo and Cheng walked from the jeep across the soccer field to Liu's car. At the car, Cheng directed Daung to see if Liu had any money in his pockets, and Daung pulled Liu's pants pockets inside out. Daung also stated that at that time, Liu's hands were tied behind his back with his necktie, but he did not

know how Cheng alone could have tied Liu's hands in that fashion.

At trial, Daung's testimony was the primary basis of his defense. Daung testified that he thought Cheng was "joking" when Cheng had said he was going to "do a restaurant" on Saturday, September 3. He also testified that he had been asleep during the return trip from Richmond and had not heard Cheng discuss robbing a restaurant that night.

According to Daung's trial testimony, on the night of the murder Cheng drove his jeep to Daung's home at about 10:00. Cheng, Samo and Daung then proceeded in the jeep to Liu's restaurant. At Cheng's direction, Daung parked the jeep across the street from the restaurant while Cheng went alone into the restaurant to talk to Liu, whom Daung believed was Cheng's friend. Fifteen to twenty minutes later, Cheng exited the restaurant and returned to the jeep. Cheng climbed into the driver's seat and drove the jeep into the parking lot of the shopping center where the restaurant was located. Cheng told Daung and Samo that he had to wait for Liu because Liu wanted to talk to Cheng at Liu's house. About half an hour later, Liu emerged from the restaurant alone, went straight to his car, and began to drive away. Cheng told Daung to drive the jeep and to follow Liu's car. When Liu stopped at a stop sign, Cheng directed Daung to ram Liu's car with the jeep. Daung thought Cheng was "joking," but when he looked at Cheng, who was in the back of the jeep, Cheng was laying down and pointing a gun in Daung's face. Daung then drove the jeep into the back of Liu's car. Liu got out of his car, wrote down the license number of the jeep, and demanded to see the registration for the jeep. Daung gave Liu the registration. While Liu was writing down the registration information, Cheng exited the back of the jeep and confronted Liu with the gun. Liu recognized Cheng and asked him what was happening. Cheng told Liu to be quiet and to go to his car. Cheng also told Daung and Samo to get out of the jeep. Cheng told Daung he wanted him to tie up Liu, but Daung refused. Samo also refused. Cheng then told Daung and Samo that "if we try any stupid thing like try to run away from him," he would go straight to Daung's house and kill anybody he found there, including Daung's fiancee. Thereupon, Cheng told Daung to drive the jeep with Samo to Kenmore School and wait for him there while he went with Liu.

Daung and Samo discussed abandoning Cheng, but Daung decided against doing so because of his concern for the safety of his family and fiancee. Consequently, Daung followed Cheng, who was riding with Liu, onto the beltway where Daung passed Cheng and proceeded to the school. After waiting twenty to thirty minutes at the school, Daung and Samo saw Cheng approach them from across the soccer field. Cheng told them that he had killed Liu and ordered them at gunpoint to walk with him to Liu's car. Once at Liu's car, Cheng order Daung to check Liu's pockets for money. Daung found no money.

Subsequently, Cheng drove Daung back to Daung's home and again threatened him to ensure his silence. To emphasize his threat, Cheng fired a shot into the floorboard of the jeep. Daung did not report the incident to the police out of fear for his family's safety.

## I. The Sufficiency of the Evidence Issue

We first consider whether Daung's convictions were supported by the evidence. When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all of the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988). The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it. *Id.*; Code § 8.01-680. "We may not weigh the evidence as the jury was required to do. Rather, we must 'look to the whole evidence and view it with the conflicts . . . and the fair inferences . . . settled as determined by the jury.'" *Wood v. Commonwealth*, 8 Va. App. 560, 563, 382 S.E.2d 306, 308 (1989)(quoting *Russo v. Commonwealth*, 207 Va. 251, 252, 148 S.E.2d 820, 822 (1966)).

Daung argues first that the evidence proves that he was not present at Liu's car when Cheng actually committed the robbery and murder. He then argues that since the Commonwealth could not prove directly, or circumstantially, that Daung had any involvement in any of the crimes charged, the Commonwealth "created a conspiracy" and designated Daung a co-conspirator, thereby attributing to him the acts of another. Daung further argues that no conspiracy existed because Daung did not agree with Cheng to

commit a criminal offense. In support of this argument, Daung asserts that, at most, the evidence only establishes that Daung was present and associated with one who intended to and did commit the crimes. In short, he argues that, at most, the evidence placed Daung in "a climate of activity that reeks of something foul." We disagree.

■ The evidence, while primarily circumstantial, supports the jury's determination that Daung was a co-conspirator and a principal in the second degree to the substantive crimes. While suspicion of guilt is never enough to sustain a conviction, *see Sutphin v. Commonwealth*, 1 Va. App. 241, 244, 337 S.E.2d 897, 898 (1985), " '[c]ircumstantial evidence is as acceptable to prove guilt as direct evidence.' " *Cirios v. Commonwealth*, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988)(quoting *Parks v. Commonwealth*, 221 Va. 492, 494, 270 S.E.2d 755, 759 (1980), *cert. denied*, 450 U.S. 1029 (1981)). When the Commonwealth relies primarily upon circumstantial evidence to establish the guilt of a defendant:

"[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt."

*Boothe v. Commonwealth*, 4 Va. App. 484, 492, 358 S.E.2d 740, 745 (1987)(quoting *Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984)).

■ "A conspiracy is 'an agreement between two or more persons by some concerted action to commit an offense.' " *Brown v. Commonwealth*, 3 Va. App. 101, 107, 348 S.E.2d 408, 411 (1986)(citations omitted). "A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Hall v. Commonwealth*, 8 Va. App. 526, 530, 383 S.E.2d 18, 21 (1989)(quoting *Jones v. Commonwealth*, 208 Va. 370, 372, 157 S.E.2d 907, 909 (1967)).

Here, the evidence established that the motive for the crimes was to "rob a restaurant." Cheng discussed his plan to commit

that crime in the presence of Daung and Samo. On the night the crimes were committed, Cheng announced again in the presence of Daung and Samo that he was going to commit the robbery "tonight" and he instructed Daung and Samo to "bring the gun and the jeep." While Amir did not know whether Daung was asleep when these remarks were made, it was for the jury to decide if Cheng had made these remarks to Daung when he was asleep. The conclusion that Daung was not asleep but, rather, heard the remarks and agreed to their content is supported by Daung's conduct on the night of the crimes, which was entirely consistent with the plan. Along with Cheng and Samo, Daung went to Liu's restaurant that night and parked the jeep on the far side of the street from the shopping center where the restaurant was located. Daung and Samo waited in the jeep while Cheng entered the restaurant. After a period of time, Cheng returned to the jeep and the three men waited until Liu exited the restaurant and entered his car. Daung drove the jeep until Liu stopped for a stop sign. Daung then rammed Liu's car with the jeep. When Liu exited his car, Cheng was provided the opportunity to confront Liu with a gun and to abduct him in Liu's car to the site of the robbery and murder. Daung then drove the jeep to the site where he was rejoined by Cheng. Thereafter, Cheng, Samo and Daung went to the murder scene where Daung admittedly searched Liu's pockets for money. Thus, the evidence of motive, time, place, means and conduct all concurred to form an unbroken chain which established a conspiracy to commit the crimes and that Daung was a co-conspirator with Cheng. Similarly, the evidence established that Daung participated in the abduction of Liu, and that Daung, if not a perpetrator of the robbery and murder, was present, actually or constructively, and assisted Cheng in the commission of the crimes; thus, Daung was a principal in the second degree and equally accountable for the commission of these crimes.

Daung's inconsistent statements to the police and his trial testimony do not alter this conclusion, but, rather, support it. The jury did not accept Daung's version of the events on the night in question. Moreover, the jury was entitled to conclude that Daung was not truthful and to infer that he was not truthful in order to conceal his guilt. *See Speight v. Commonwealth*, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987). For these reasons, we hold that the evidence was sufficient to support Daung's convictions.

## II. The Duress Instruction Issue

We turn now to Daung's assertion that the trial court erred by refusing to instruct the jury that the common law defense of duress can be based upon threats to harm the defendant's family.

At the conclusion of all of the evidence and with Daung's consent, the trial court gave the jury the following model jury instruction on the defense of duress.

If you find from the evidence that the defendant acted under duress, then you must find him not guilty. In order for the defendant to use the defense of duress, you must find from the evidence that he was threatened and that he had a reasonable fear of immediate death or serious bodily injury. The defense of duress is not available if the defendant had a reasonable opportunity to escape and did not do so or had a reasonable opportunity to avoid committing the crime without being harmed.

2 *Virginia Model Jury Instructions—Criminal* 353 (1989 repl. ed. with 1990 Supp.)

After deliberating for some time, the jury returned to ask the court whether under this instruction the defense of duress included threats made to the defendant's family and whether the word "immediate" can mean "as long as the individual who made the threat is able to carry through with it." Although Daung's counsel argued that the duress defense implicitly included threats of harm to family members and that "immediate" could cover a span of time depending on the circumstances, the court instructed the jury that the defense of duress did not extend to family members and that immediate meant "now" rather than some time in the future.

As we have noted, portions of Daung's testimony at trial and his previous recorded statements to the police conflict. The resolution of that conflict and the ultimate determination of the truthfulness of Daung's testimony is appropriately within the province of the jury. However, where evidence tends to sustain the defense theory of the case, the trial court is required to give requested instructions covering that theory. *See Diffendal v. Commonwealth*, 8 Va. App. 417, 422, 382 S.E.2d 24, 26 (1989). Ac-

cordingly, for purposes of resolving the issue of the trial court's jury instruction, we are only concerned with Daung's version of the events surrounding the crimes and not a determination of its truthfulness.

According to Daung, he thought Cheng was joking when Cheng had said he was going to "do a restaurant" and that he had been asleep when Cheng said he was going to do so that night. Daung maintained that he rammed the jeep into the victim's car because Cheng threatened him with a gun. Daung further maintained that he drove the jeep to the Kenmore School and waited for Cheng. Subsequently, he went to the murder scene and looked into the victim's pockets for money because of Cheng's threat that "if we do any stupid thing like trying to run away from him," he would go straight to Daung's house and kill anybody he found there, including Daung's fiancee. There is no dispute that Cheng knew where Daung lived and that Cheng had the means to carry out his threat.

Initially, we note that the Commonwealth correctly points out that, according to Daung's version of the events surrounding the crimes in this case, when he rammed the victim's car he did so as a result of personal threats to him and not to members of his family. Accordingly, to that extent, the duress instruction given by the court was proper. However, Daung's version of the events in question also included threats to his family which occurred prior to the robbery and murder and a major portion of the abduction.[1] It is this version of the events that requires that we decide whether in Virginia the defense of duress includes threats made to a defendant's family and whether the trial court erred in failing to give such an instruction to the jury in this case.

■ To date, no Virginia case has resolved the issue of whether the defense of duress should extend to criminal acts committed in response to threats made against anyone other than the defendant. However, a majority of jurisdictions and several legal scholars have addressed the issue and have determined that the defense is available when the defendant performed a criminal act in response

---

[1] For purposes of our decision, we need not draw a distinction between whether the detention of the victim which occurred immediately after his car was rammed or the detention which occurred while the victim was transported to his death some distance away constituted the abduction.

to threats of harm against third persons. *See, e.g.*, 2 P. Robinson, *Criminal Law Defenses* 360 n.29 (1984). Without deciding whether the defense of duress applies to threats of harm made against *any* third person, we hold the defense of duress may be available to a defendant who has committed a criminal act because of threats made against members of the defendant's family. We believe this holding is consistent with both human experience and the rationale behind the defense of duress. Human experience demonstrates that individuals often are more willing to subject themselves to great risks when a loved one is threatened with harm than when threatened with harm themselves. Thus, a person should not be expected to exercise greater restraint when faced with threats of harm to his family rather than to himself.

■ "The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." 1 W. LaFave & A. Scott, *Substantive Criminal Law* 614 (1986). Thus, a person subject to duress may justifiably violate the literal language of the criminal law in order to avoid a harm of greater magnitude. *Id.* at 615; *Pancoast v. Commonwealth*, 2 Va. App. 28, 33, 340 S.E.2d 833, 836 (1986). When balanced against a lesser evil, a greater evil, whether committed against the defendant or a member of the defendant's family, is still less desirable for reasons of social policy. Therefore, we see no reason to distinguish between a threat of harm directed against the defendant and a threat of harm against members of the defendant's family.

Having determined that the defense of duress is applicable to cases involving threats of harm against a defendant's family members, we now turn to the issue of whether in the present case the trial court erred by refusing to instruct the jury that the defense can be based upon such threats. For purposes of our resolution of this issue, we assume that Daung was not a co-perpetrator with Cheng in the murder. We do not suggest that in such a case the murder of Liu would be a lesser evil that would justify the avoidance of the greater evil of the death or serious injury to Daung's family. However, viewed in the light most favorable to Daung's defense, Daung only actually participated in the abduction and robbery of Liu and was unaware that Cheng intended to kill Liu. In this context, Daung was guilty of felony murder for Liu's death

based on his participation in the underlying abduction and robbery felonies. If Daung's participation in the underlying abduction and robbery is justified because of threats to kill his family, then the basis for Daung's felony murder conviction is eliminated and Daung also should be excused for the murder. *See* LaFave & Scott, *supra* at 618. Consequently, we must decide whether the evidence, when viewed most favorably to Daung's duress defense, could support a finding that Daung was involved in the abduction and robbery because of threats to harm his family. *See McCoy v. Commonwealth*, 9 Va. App. 227, 229, 385 S.E.2d 628, 629 (1989).

■ To support a defense of duress, a defendant must demonstrate that his criminal conduct was the product of an unlawful threat that caused him reasonably to believe that performing the criminal conduct was his only reasonable opportunity to avoid imminent death or serious bodily harm, either to himself or to another. *See Pancoast*, 2 Va. App. at 33, 340 S.E.2d at 836; *United States v. Bailey*, 444 U.S. 394, 410-11 (1980); LaFave & Scott, *supra* at 614. However, a defendant may not rely on the defense if he had a reasonable opportunity " 'both to refuse to do the criminal act and also to avoid the threatened harm.' " *Bailey*, 444 U.S. at 410 (quoting W. LaFave & A. Scott, *Handbook on Criminal Law* 379 (1972)); *accord Pancoast*, 2 Va. App. at 33, 340 S.E.2d at 836. In the present case, there is evidence that Cheng threatened to harm Daung's family. Therefore, we must determine whether Daung reasonably feared that his refusal to participate in the abduction of Liu would have resulted in *imminent* death or serious injury to his family, and whether participating in the abduction was Daung's *only* reasonable opportunity to avoid the harm to Daung's family.

At trial, the court ruled the defense of duress was only available if the threatened harm was "immediate," which the court interpreted as meaning "now" rather than some time in the future. On appeal, the Commonwealth argues the evidence does not warrant an instruction on the defense of duress for threats to harm Daung's family because none of his family members were present when Cheng made his threat, and, therefore, were not subject to "immediate" harm from Cheng. We believe the Commonwealth interprets too strictly the temporal aspect of the defense, and we choose not to adopt such an approach to the defense of duress.

■ Admittedly, we previously used the terms "imminent" and "immediate" interchangeably and did not distinguish between them when we discussed the defense of duress in *Pancoast*. Nonetheless, the difference between the two terms has been addressed by others, and we believe the distinction is a valid one that needs to be made in this case. Regardless of whether a court adheres to the imminent standard or the immediate standard or does not distinguish between them, threats of "future" harm are generally held insufficient to sustain a defense of duress. Like other courts, we have held that "[v]ague threats of future harm, however alarming, will not suffice to excuse criminal conduct." *Pancoast*, 2 Va. App. at 33, 340 S.E.2d at 836 (citations omitted). Nonetheless, the distinction of threats of imminent or immediate harm from threats of future harm is somewhat of a fiction. "To say that a threat of future harm is not sufficient is to ignore the fact that the nature of a threat is to hold out a future harm. All danger to the 'duressed' is in the future . . . . [When] one seeks to avoid it, such avoidance implies a temporality not coterminous with the harm threatened." Robinson, *supra*, at 359. "Threats of future harm" denotes threats of harm that might occur at some uncertain time that is distant and separate from the period of duress or coercion. Therefore, the temporal proximity of the threat and the threatened harm is the true issue, and the proper distinction between imminent and immediate harm is how far in the future is the harm to occur from the time the threat is made.

■ While the term "immediate" is commonly understood to mean instant or direct, the term "imminent" has a connotation that is less than "immediate," yet still impending and present. In one jurisdiction that adopted the "imminent" harm approach to duress, the court explained that "a threat directed to some indefinite time in the future is not an imminent threat." *State v. Harding*, 635 P.2d 33, 35 (Utah 1981). Some courts have construed the imminence requirement to be a factual determination based on all of the circumstances, including the defendant's ability to avoid the harm. Robinson, *supra*, at 359 (citing *e.g., People v. Maes*, 41 Colo. App. 75, 583 P.2d 942 (1978)). In view of the underlying rationale of the defense of duress, we believe that, to the extent a distinction needs to be made, the more appropriate approach to the defense of duress is to require a showing of "imminent" harm rather than the stricter and more limiting "immediate" harm. We also feel this approach is consistent with our

*Pancoast* decision.

In *Pancoast*, a female intern at the Medical College of Virginia made out two prescriptions to fictitious patients in order to obtain drugs for her husband, who was addicted to drugs and also a pharmacist. At trial, she relied on the defense of duress and presented evidence that her husband used various forms of mental and physical abuse, including hitting her on occasion, to pressure her to write him prescriptions. For the first prescription, she claimed her husband denied her sleep after she finished working at the hospital for two days without sleep. Her husband reportedly was in a frantic state and threatened to do "something crazy" if she did not write him a prescription. We found that the evidence failed to support the defense of duress because there was "nothing in the record to indicate that she was in fear of imminent death or serious bodily injury." 2 Va. App. at 34, 340 S.E.2d at 837. On the second occasion, she based her defense on her allegations that her husband had hit her and threatened her with death if she did not go with him to a drug store and help him obtain some drugs. However, we noted "[h]er husband did not stay with her at all times while in the pharmacy, nor was he then presently threatening her. Had she so desired, she could have informed the pharmacist, in some manner, that the prescription was fraudulent." *Id.* at 34, 340 S.E.2d at 836. While accepting that the appellant was subject to a threat of imminent harm, we held that the defense of duress did not excuse her since she failed to take advantage of an opportunity to avoid the criminal conduct when she wrote the second prescription.

In the present case, the jury could have reasonably determined that Daung was subject to a threat of imminent harm to his family. If accepted by the jury, Cheng told Daung that he would go straight to Daung's home and kill anybody he found there if Daung did not assist him in the abduction and robbery of Liu by driving his jeep to Kenmore School. Though Cheng could not have killed any members of Daung's family at the moment he made the threat, Cheng intended to and was able to carry out the threatened harm as soon as he could drive to Daung's home. Cheng had the means to carry out his threat because he had a gun, a car, and knew where Daung lived. The harm was not to occur at some uncertain distant time in the future. Instead, the threat and the harm were separated only by the time it would take

Cheng to drive to Daung's home. Thus, the jury could have determined that Daung was threatened with imminent harm.

We hold, however, that, under the circumstances of this case, the jury could not have reasonably found that Daung reasonably believed his participation in the crime was the *only* reasonable opportunity he had to prevent his family from being harmed. The evidence establishes as a matter of law that after Cheng left in Liu's car, Daung had a reasonable opportunity to avoid any further participation in the crimes, and to obtain aid from the police or to warn his family before Cheng was able to carry out his threat. Therefore, we hold that the jury could not have found that Daung reasonably believed driving to Kenmore School was the only reasonable opportunity he had to avoid Cheng harming members of his family.

For these reasons, while we hold that the defense of duress encompasses threats to the defendant's family, we also hold that the trial court did not err in refusing to so instruct the jury because Daung was not entitled to such an instruction based on his own version of the facts. Having determined that the evidence was sufficient to support his convictions, we affirm those convictions.

*Affirmed.*

Baker, J., and Duff, J., concurred.