COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Chief Judge Decker, Judges Malveaux and Raphael


MELISSA JOYCE MOEN

                                                    MEMORANDUM OPINION*
v.       Record No. 1937-23-1                            PER CURIAM
                                                     NOVEMBER 26, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Tonya Henderson-Stith, Judge

(Samantha Offutt Thames, Senior Appellate Counsel; Virginia
Indigent Defense Commission, on briefs), for appellant.

(Jason S. Miyares, Attorney General; Tanner M. Russo, Assistant
Attorney General, on brief), for appellee.


Melissa Joyce Moen ("appellant") was convicted in a bench trial of two counts of

abduction, in violation of Code § 18.2-47(A), and one count of breaking and entering while

armed with a deadly weapon, in violation of Code § 18.2-89.  Appellant contends the trial court

erred in rejecting her affirmative defense of duress and in denying her motion to strike both

charges because the evidence failed to prove she shared the principals' criminal intent.  After

examining the briefs and record in this case, the panel unanimously holds that oral argument is

unnecessary because "the appeal is wholly without merit," "the dispositive issue or issues have been

authoritatively decided," and "the appellant has not argued that the case law should be overturned,

extended, modified, or reversed."  Code § 17.1-403(ii)(a)-(b); Rule 5A:27(a)-(b).  Accordingly,

finding no error in the trial court's judgment, we affirm appellant's convictions.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

I.  BACKGROUND

"In accordance with familiar principles of appellate review," the facts relevant here "will be considered in the light most favorable to the Commonwealth, the prevailing party below." *Spinner v. Commonwealth*, 297 Va. 384, 387 (2019).

The Home Invasion

In 2018, Lionel Maynard, Sr., his wife, and his great-grandson, Landon Sims, lived together in Hampton.  Sims' girlfriend, Julia Wilson, occasionally stayed at the Maynard home. Wilson previously had dated Bobbie Crane.  Maynard testified that one day in June 2018, he found Crane in his yard "yelling and screaming at [Sims]."  When Maynard asked Crane what his "problem" was, Crane replied that Sims had "stolen his girlfriend."  Crane also told Sims that summer that he was going to have "some of his boys" come to Sims's house and that Sims would "have to worry about [Crane's] boys."

After midnight on October 5, 2018, Sims stepped out onto the back patio of the Maynard home and saw two men with masks and guns.  The men attacked Sims, hit him in the head with their guns, and "forced their way" into the house.[1]  Once inside, the men beat Sims, attempted to tie his hands behind his back, and stabbed him in his stomach, back, arms, and head.  They also dragged Sims throughout the house.  Eventually, Sims heard a gunshot and "was . . . able to scramble and call 911."

Maynard testified that he was asleep during the early morning hours of October 5 when a masked and armed man entered his bedroom, turned on the light, and "yanked [him] out of bed."[2]  Maynard could hear Sims "yelling and screaming up the hallway."  The intruder dragged

_____

[1] Maynard testified that the screen on his back door "was cut," and photographs of the screen and door were entered into evidence at trial.

[2] At the time of the home invasion, Maynard was 84 years old.

Maynard into the hallway, and then Maynard heard a gunshot and saw another person stabbing Sims. When Maynard began struggling, one of the intruders "cracked [his] skull open" with his gun; the man again struck Maynard's head as he continued to struggle. At that point, Maynard decided to "act like [he was] dead." He saw the two men drag Sims back toward Sims' bedroom while asking him, "where is Julia[?]"[3]

After the two men took Sims into his bedroom, Maynard crawled to the living room and retrieved a pistol. He fired a single shot at one of the intruders and heard the man scream. The remaining intruder took the pistol away from Maynard and struck him on the side of the head, at which point Maynard passed out. When he regained consciousness, the intruders were gone.

Events at Kristen Windham's Apartment

Kristen Windham lived in Newport News in 2018. Windham had met appellant through a mutual friend and known her for about a year at the time of the home invasion. Windham thought she and appellant "were friends."

On the evening of October 3, 2018, appellant arrived at Windham's apartment in the company of two men, Demoreia Farrell, or "Moe," and Christopher Cox. Windham was familiar with Moe and knew Cox as appellant's boyfriend. The three guests stayed with Windham on the night of October 3 and were also in her home on the evening of October 4. At some point during the early evening of October 4, appellant and Cox left the apartment. When the two returned at around 11:30 p.m., Windham and appellant went to a restaurant together while Cox and Moe remained at Windham's home. After the two women came back, Windham fell asleep on her couch but was later awakened by Moe, who told Windham her guests were "leav[ing] to go and handle some business."

---

[3] Wilson was not in the Maynard home during the invasion.

Windham fell asleep again until appellant telephoned to say, "[w]e're on our way back, unlock the door." After unlocking the door, Windham started to go back to sleep until Cox slammed the door open and yelled for her to come outside. There, she saw Cox "dragging" Moe's body out of the backseat of appellant's car. Appellant ran past Windham to retrieve some belongings from the apartment. Windham asked what had happened, but no one answered her. Cox "dropped" Moe, ran to appellant's car, and left with her.

Windham called 911. Emergency medical personnel soon arrived, but were unable to save Moe's life. Windham told police she had no knowledge about what appellant, Cox, and Moe had been doing or how Moe came to be injured.

Appellant's Apprehension and Statements to Police

Windham helped police identify appellant's car. Following a pursuit, police in Maryland, where appellant lived, stopped appellant and Cox. Appellant subsequently was indicted for two counts of abduction and one count of breaking and entering while armed with a deadly weapon.

On the morning of October 6, 2018, Detective Michael Beres and Investigator Quincina Neal of the Hampton Police Division interviewed appellant in custody in Maryland. Appellant was given *Miranda* warnings and signed a *Miranda* waiver.[4] She then told police she had driven Moe and another person to a neighborhood and dropped them off and waited. Appellant heard a few shots before Moe returned to the car alone. Appellant told police, "I don't know what was going on, I thought they were going to fight somebody. . . . [T]o beat somebody up." She then requested an attorney and the interview ended.

After the October 6 interview, police developed additional evidence and information about the home invasion. In addition to Cox, Moe, and appellant, police also began to suspect the involvement of Bobbie Crane, appellant's former high school classmate.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Beres and Neal returned to Maryland on October 22, 2018 to extradite appellant to Virginia. Appellant was given *Miranda* warnings and consented to speak with the officers during their five-and-a-half-hour drive to Hampton. The interview was recorded, with appellant's knowledge, and entered into evidence at trial.

Appellant initially maintained she knew nothing about the events of October 5, apart from what she had read in an affidavit. She acknowledged driving to the Maynard home and parking across the street. Appellant told police there were three people with her at that time: Cox, Moe, and "some dude with Moe" she knew as "B." Moe and Cox had been riding with her when she left Windham's apartment, and they had stopped to pick up "B" at a gas station. Appellant could give only a general description of "B." She said Cox remained in the car with her when she parked at the Maynard home and that Moe and "B" got out of the car; when the two men returned, one of them told her to "go." Moe said he had been shot and asked appellant to drive him back to Windham's apartment. "B" did not get back in appellant's car and appellant did not know where he had gone.

Police accused appellant of being untruthful in stating that she picked up "B" and that Cox had never entered the home. When Neal told appellant, "[a]ll that's a lie," appellant, in tears, replied, "[i]t is. It is." When police asked her why she would lie, appellant responded, "[b]ecause I don't want my life to be in jeopardy."

Appellant then said that Moe had given her an address to drive to and told her they were going to get some "weed and stuff." When they arrived at the address, Cox and Moe got out of the car. Appellant acknowledged hearing gunshots while she waited in her car, but said she did not think anything of them because they were "muffled" and did not sound "close."

Police also asked appellant whether, prior to driving to the Maynard home, she had left Windham's apartment with Windham, Cox, or Moe. Appellant initially replied, "no," before

immediately stating she had "left by myself to go visit a friend of mine . . . Nobody went with me anywhere." When appellant returned, everyone said, "let's go get this weed." Police confronted appellant with the fact that in her previous interview, she had told them the men with her had gone to the house to beat someone up; now, appellant's account was that they were going there to buy marijuana. Appellant explained the discrepancy by stating that in the car, Moe said that "if this dude don't have something," he was going to "beat him up."

Appellant accused Moe of threatening her and pulling a gun on her in Maryland to force her to drive Moe and Cox to Windham's home in Virginia. She also accused Moe of burning her with a cigarette.

Several hours into the interview, police asked appellant about Bobbie Crane. Appellant said she had attended school with Crane, and immediately declared that she had not seen him "in years." But she then stated she had spoken with him "recently" about helping a friend get her car fixed and possibly working for Crane as a property manager. Police indicated they needed to know what appellant might have agreed with Crane. She told them, "[y]ou don't understand. [Crane]'s got ties to some kind of cartel and mafia," and that she was "just supposed to show loyalty to [Crane]."

Appellant then explained that when she went to see Crane about some auto parts, Crane conveyed that his family was still involved with the drug trade. Appellant told Crane she would "run . . . drugs real quick" for him so she could earn some badly needed money. Crane replied that he would not give her any drugs to sell unless she had "a team" that Crane knew was "safe." After involving both Cox and Moe, appellant told Crane she had "got . . . a team together." She soon learned that someone in Virginia was "causing problems" for Crane and that he "want[ed] these people beat up." Appellant told police that she did not want to go to Virginia, but Moe said he needed money; he grabbed appellant by the throat, burned her with a cigarette, and put a gun

to her head. Later, in Virginia, Crane sent appellant the Maynard's address and Moe told her, "I need you to take me to this house." She was told that Crane "want[ed] teeth," but "thought they were bullshitting" and did not think Crane's targets would be subjected to anything more than a "normal ass-whoopin'."

Events at Trial

At the close of the Commonwealth's case-in-chief, appellant moved to strike both charges. Counsel for appellant acknowledged the "argument of concertive [sic] action," but contended the evidence did not "indicate that [appellant] was aware of any abduction that was going to be happening, only a malicious wounding." Additionally, counsel asserted there was no "specific evidence of [appellant] being aware that there would be the . . . breaking and entering, only that she would be the get-a-way driver." The trial court denied the motion.

Appellant testified that in September 2018, she knew Cox and Moe wanted to start selling drugs, and Crane was someone with "decent prices" she could "hook them up with." But Crane "didn't know them, so he didn't trust them" and "needed to see what their loyalty was." Crane "had an issue with someone" and wanted "to scare them" and "to see teeth." Appellant repeated her earlier account of Moe's threats and abusive conduct when she expressed reluctance to take Cox and Moe to Virginia. She also entered into evidence a photograph of a burn on her arm, but acknowledged that the photograph had been taken some three weeks after her reported confrontation with Moe. Appellant said she drove Moe and Cox to Virginia because she was afraid, since she "didn't know . . . if [Moe] would kill [her]."

Appellant said that on October 4, 2018, she drove alone to Crane's house, where he told her, "[i]f you get caught or you tell, I'm coming after you and your family." Appellant testified that Crane knew where her family lived and she believed his threat because she had seen him "attack somebody . . . in high school," and thus did not "put anything past him."

Appellant acknowledged she had not been truthful with police during her first interview, because she was "scared of what . . . Crane might do." She agreed that at no time prior to the home invasion did she feel she could leave or otherwise disengage from the planned conduct, because Moe and Cox "were with [her] 24 hours a day" except for when she visited Crane's house on October 4. Appellant "knew if [she] disengaged then, . . . they know where my family lives." She said she felt "terrified," because she had been told "numerous times" by Crane that if she "told" about the plan, Crane "was coming after [her] and [her] family." Appellant understood this to mean Crane would "possibly try[] to kill [her]," and that if she did not do as she was told, she and her family would suffer "bodily harm."

Appellant acknowledged on cross-examination she was a five-time convicted felon, including for uttering and forgery. She denied agreeing to participate in Crane's scheme because she wanted to make money from drugs, and denied needing money at the time.

Appellant renewed her motion to strike, including a contention that she had established an affirmative defense of duress based on her testimony about threats to herself and her family. The trial court denied the motion.

Following closing argument, the trial court convicted appellant of both counts of abduction and the single count of breaking and entering while armed with a deadly weapon. This appeal followed.

## II. ANALYSIS

### A. Duress

Appellant contends the trial court erred in rejecting her affirmative defense of duress. Specifically, she argues that she "was confronted with two overlapping threats: to her own life from Moe, and her family from [Crane]." Because these threats were imminent, she had no reasonable alternative to violating the law to avoid them, and her unlawful acts were directly

causally related to the threats, appellant contends the evidence was sufficient to establish her defense of duress. We disagree.

Duress is an affirmative defense. *Graham v. Commonwealth*, 31 Va. App. 662, 674 (2000). While "the Commonwealth bears the burden of proving every essential element of an offense beyond a reasonable doubt . . . , it is the defendant that bears the burden of producing evidence in support of an affirmative defense." *Foley v. Commonwealth*, 63 Va. App. 186, 199 (2014) (quoting *Williams v. Commonwealth*, 57 Va. App. 341, 351 (2010)). "[W]hether duress . . . is established is a factual issue that is usually determined by the [fact-finder]." *Warren v. Commonwealth*, 76 Va. App. 788, 804 (2023) (quoting Ronald J. Bacigal & Corinna Barrett Lain, *Va. Prac. Crim. Proc.* § 17:33 (2022-23 ed.)). "Where factual findings are at issue in . . . an appeal, great deference is given to the trier of fact, in this case the trial court," *Thorne v. Commonwealth*, 66 Va. App. 248, 253 (2016), and "[a]n appellate court is not permitted to substitute its own judgment for that of the [trier] of fact, even if the appellate court might have reached a different conclusion," *Farah v. Commonwealth*, 300 Va. 458, 469-70 (2022) (quoting *Commonwealth v. Presley*, 256 Va. 465, 466 (1998)). "We will not set aside the factual findings of a trial court unless they are 'plainly wrong or without evidence to support [them.]'" *Id.* at 470 (alteration in original) (quoting Code § 8.01-680).

"Duress excuses criminal behavior 'where the defendant shows that the acts were the product of threats inducing a reasonable fear of immediate death or serious bodily injury.'" *Graham*, 31 Va. App. at 674 (quoting *Pancoast v. Commonwealth*, 2 Va. App. 28, 33 (1986)). Accordingly, to establish duress, a defendant must demonstrate "(1) a reasonable belief that the action was necessary to avoid an imminent threatened harm; (2) a lack of other adequate means to avoid the threatened harm; and (3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm." *Edmonds v.*

*Commonwealth*, 292 Va. 301, 306 (2016) (quoting *Humphrey v. Commonwealth*, 37 Va. App. 36, 45 (2001)). To satisfy the imminent threat requirement, a defendant "must demonstrate 'an immediate, real threat to [their] safety,'" *id.* at 306-07 (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)), or the safety "of the defendant's family," *Sam v. Commonwealth*, 13 Va. App. 312, 323 (1991). And to establish the requisite nexus between the commission of a criminal act and avoidance of the threatened harm, a defendant must show "that the threat, which is 'specifically directed toward causing [them] to commit the crime charged,' was coupled with evidence that [they] 'reasonably believed that participation in the crime was the *only* way to avoid the threatened harm.'" *Graham*, 31 Va. App. at 675 (quoting Roger D. Groot, *Crim. Offenses and Defenses* 181 (4th ed. 1999)). Thus, "[w]here the defendant fails 'to take advantage of a reasonable opportunity to escape, or of a reasonable opportunity to avoid doing the acts without being harmed, [they] may not rely on duress as a defense.'" *Id.* at 674-75 (quoting *Pancoast*, 2 Va. App. at 33); *see also Pancoast*, 2 Va. App. at 34 (noting that where one "fail[s] to take advantage of an alternative to criminal conduct," they "may not rely on the defense of duress").

Here, in rejecting appellant's affirmative defense, the trial court necessarily found that appellant's evidence had failed to establish duress. Based on the record before us, we hold that this factual finding was not plainly wrong. Even assuming arguendo that the threats alleged by appellant were real and imminent, the trial court could conclude that appellant failed to take advantage of reasonable opportunities to escape her circumstances and avoid engaging in criminal conduct. Although appellant testified that one of the men who allegedly threatened her, Moe, was "with [her] 24 hours a day" in the period immediately prior to the home invasion, she also testified that she drove alone from Windham's apartment to Crane's home on the evening before the invasion. Appellant also told police that she left Windham's apartment "by [herself]

- 10 -

to go visit a friend" that evening—presumably Crane. And Windham testified that she and appellant went to a restaurant together on the evening before the home invasion, while Moe remained at Windham's apartment. Appellant acknowledged to police and the trial court that she had given conflicting, sometimes untruthful, accounts of the events preceding the home invasion. The trial court, in its role as fact-finder, was free to judge appellant's credibility and to disbelieve some of her testimony as self-serving. *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (en banc); *see also Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (noting that a fact-finder is "free to believe or disbelieve, in part or in whole, the testimony of any witness"). Though appellant maintained she could not "disengage[]" from participating in criminal conduct because of threats by Moe and Crane,[5] the trial court, as fact-finder, had sufficient evidence before it to conclude otherwise, and to find that appellant had multiple reasonable opportunities to escape and seek police protection for herself and her family.[6]

_____

[5] In contending she had no reasonable alternative to engaging in criminal conduct to preserve her and her family's safety, appellant asserts that "Moe and [Cox] were her constant companions in this trip. They were with her throughout the days [sic] they spent in Virginia"; therefore, it is "not realistic . . . to believe that she could have safely called the police or aborted the mission." But this carefully selective presentation of the facts elides the fact that, as noted above, appellant's own testimony, and that of Windham, was that appellant was away from Moe at least twice on the evening of the home invasion. And although appellant makes reference to Cox, she testified that Cox "never made any direct threats" to her and argues on brief only that she faced "overlapping threats . . . from Moe, and . . . from [Crane]."

[6] Because we hold the evidence did not establish appellant lacked reasonable opportunities to escape and avoid committing criminal acts, we need not inquire into the evidence supporting the other elements of duress. But we note that the trial court, as fact-finder, was free to consider appellant's admitted falsehoods to police, numerous changes to her account of events, and convictions for crimes implicating veracity in considering whether she credibly alleged imminent, real threats to her safety.

- 11 -

B. Sufficiency

Appellant challenges the sufficiency of the evidence to prove she was a principal in the second degree who shared Moe and Cox's criminal intent to break and enter the Maynard home and commit two abductions. She contends there is "no . . . evidence" of such a shared intent.

"When presented with a sufficiency challenge in criminal cases, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)). "Considering the evidence from that vantage point, '[a]n appellate court does not "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt."'" *Id.* (alteration in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Rather, "the only 'relevant question is . . . , whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). Consequently, "[t]he judgment of the trial court, sitting without a jury, is entitled to the same weight as a jury verdict and will not be disturbed on appeal unless 'plainly wrong or without evidence to support it.'" *Williams*, 278 Va. at 193 (quoting Code § 8.01-680).

Code § 18.2-18 provides, in pertinent part, that "[i]n the case of every felony, every principal in the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." "A principal in the first degree is the actual perpetrator of the crime. A principal in the second degree, or an aider or abettor as he is sometimes termed, is

one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). Accordingly, "to make a person a principal in the second degree[,] actual participation in the commission of the crime is not necessary. The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime." *Id.* (quoting *Muhammad*, 269 Va. at 482).

But "[t]his rule cannot be interpreted to mean that any overt act that is advantageous to the principal's criminal plan is sufficient; the defendant must also share in the principal's criminal intent. The overt act must be 'knowingly in furtherance of the commission of the crime.'" *Id.* at 156-57 (quoting *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008)). It therefore follows that "lack of intent is usually a defense to a conviction as a principal in the second degree. The one exception exists when there was concert of action and the resulting crime, whether . . . originally contemplated or not, is a natural and probable consequence of the intended wrongful act." *Id.* at 157 (quoting *McMorris*, 276 Va. at 505-06); *see also Brown v. Commonwealth*, 130 Va. 733, 738 (1921) (noting that under concert of action theory, it is "not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose"). Under concert of action theory, therefore, "each co-actor is responsible for the acts of the others, and may not interpose his personal lack of intent as a defense." *Thomas*, 279 Va. at 158 (quoting *Carter v. Commonwealth*, 232 Va. 122, 126 (1986)). Whether an offense "is the natural and probable result of the intended wrongful act" is a question for the trier of fact. *Tibbs v. Commonwealth*, 31 Va. App. 687, 707 (2000).

Here, it is uncontroverted that appellant participated, with Moe and Cox, in Crane's plan to have people "beat up" that were "causing problems" for him—i.e., Sims and Crane's ex-girlfriend, Julia Wilson. Appellant knew that Crane "had an issue with [them]," and wanted "to scare them" and "to see teeth," before he would allow appellant, Cox, and Moe access to his drugs. Appellant maintains she neither thought nor intended that anyone would experience anything more than a "normal ass-whoopin'," or a malicious wounding, as a result of the execution of Crane's plan. But the evidence was sufficient for the trial court to conclude that the breaking and entering of the Maynard home, and Sims's and Maynard's abductions, were natural and probable consequences of the originally intended crime. That crime required physical assaults of both Sims and Wilson, which appellant, Cox, and Moe intended would occur in the environs of the Maynard home. When Moe and Cox found only Sims outside the home, a reasonable fact-finder could conclude it was a natural and probable act for the two men to "force[] their way" inside, so they could locate and beat Wilson and complete Crane's plan. A reasonable fact-finder could further conclude that once inside the Maynard home, it was natural and probable that Moe and Cox would use force and intimidation against anyone there to try and find Wilson. This they did, dragging Sims and Maynard around the house while brandishing a firearm and demanding to know, "[w]here is Julia[?]" *See* Code § 18.2-47(A) (defining statutory abduction, in pertinent part, as use of force or intimidation to seize, take, transport or detain another with the intent to deprive them of their personal liberty). The acts of Moe and Cox in breaking and entering and abducting Maynard and Sims were thus crimes that were "expedient for the[ir] common purpose," along with appellant, of assaulting Sims and Wilson. *Brown*, 130 Va. at 738. Under the theory of concert of action, appellant, as a "co-actor" in Crane's scheme, was thus "responsible for the acts of [Moe and Cox]" and unable to "interpose [her] personal lack of intent as a defense." *Thomas*, 279 Va. at 158 (quoting *Carter*, 232 Va. at 126). And

- 14 -

absent such a defense, the trial court was neither plainly wrong nor without supporting evidence in convicting appellant, as a principal in the second degree, of breaking and entering the Maynard home and abducting Maynard and Sims.[7]

### C. Scrivener's Error

Appellant was indicted for one count of breaking and entering, in violation of Code § 18.2-89, and the trial court's conviction order reflects a conviction under that statute. The trial court's sentencing order, however, reflects a conviction under Code § 18.2-91, the statutory burglary statute. We remand this matter for the limited purpose of the trial court correcting this scrivener's error in the sentencing order pursuant to Code § 8.01-428(B).

### III. CONCLUSION

For the foregoing reasons, the trial court did not err, either in rejecting appellant's duress defense or denying her motion to strike. Accordingly, the trial court's judgment is affirmed and this matter is remanded for the limited purpose of correcting the scrivener's error noted above.

*Affirmed and remanded.*

---

[7] In her reply brief, appellant relies on *McMorris* in contending that breaking and entering and abduction were not incidental, probable consequences of the group's plans and that those offenses "require[d] a different type of wrongdoing than simple assault, or even malicious wounding." But *McMorris* is distinguishable. In that case, our Supreme Court vacated the appellant's conviction for robbery as a principal in the second degree, where the appellant was one of several people who participated in an assault; when the victim dropped his phone and wallet during the attack, one of the assailants stole them. *McMorris*, 276 Va. at 506, 508. The Court rejected the Commonwealth's argument that robbery is a natural and probable consequence of an assault, noting that "[r]obbery is not an incidental, probable consequence of an assault; robbery requires a completely different type of wrongdoing: stealing." *Id.* at 508. But here, where appellant and her cohorts planned a violent physical assault on two people they expected to find at the Maynard home, breaking and entering and committing abduction to accomplish their goal were not wrongdoings of a different type. Rather, they were probable consequences of executing the intended, assaultive acts.